Austin C. Yost (034602)
Kelleen Mull (036517)
**COPPERSMITH BROCKELMAN PLC**
2800 North Central Avenue, Suite 1900
Phoenix, Arizona 85004
T: (602) 381-5485
ayost@cblawyers.com
kmull@cblawyers.com

Lindsay Herf (027554)
**ARIZONA JUSTICE PROJECT**
4001 North 3rd Street, Suite 401
Phoenix, Arizona 85012
T: (602) 844-1216
lindsay.herf@azjusticeproject.org

Karen Singer Smith (033494)
**MITCHELL STEIN CAREY CHAPMAN PC**
2600 North Central Avenue, Suite 1000
Phoenix, Arizona 85004
T: (602) 358-0290
karen@msccolaw.com

*Attorneys for Plaintiff*
*Donald Huggins*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Donald Huggins, | No. |
| Plaintiff, | **VERIFIED COMPLAINT** |
| v. | |
| Ryan Thornell, Director, Arizona Department of Corrections, Rehabilitation & Reentry, | |
| Defendant. | |

Plaintiff Donald Huggins brings this civil rights action under 42 U.S.C. § 1983 against Defendant Ryan Thornell, in his capacity as Director of the Arizona Department of Corrections, Rehabilitation & Reentry ("ADCRR"), for violating Mr. Huggins's due process rights.

A bedrock principle underlying our criminal justice system is that ADCRR—an executive agency—has no authority to ignore, rewrite, or defy criminal sentences imposed by courts. *See,*

*e.g.*, *Hill v. U.S. ex rel. Wampler*, 298 U.S. 460, 464 (1936) ("The only sentence known to the law is the sentence or judgment entered upon the records of the court."). Director Thornell flouts that principle here. Mr. Huggins thus seeks prospective injunctive and declaratory relief requiring Director Thornell to implement Mr. Huggins's final and enforceable sentence.

### Parties

1.     Mr. Huggins (ADCRR No. 128983) is 67 years old and a prisoner in ADCRR's custody. The Gila County Superior Court entered a sentence of imprisonment for Mr. Huggins in 1997 (Case Nos. CR 96-057 and 96-091). Mr. Huggins has been incarcerated for over 29 years and is currently confined in the Arizona State Prison Complex-La Palma in Eloy, Arizona.

2.     Director Thornell is the ADCRR Director. He is sued in his official capacity only. On information and belief, he resides and holds office in Maricopa County, Arizona.

### Jurisdiction and Venue

3.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 and 42 U.S.C. § 1983 because Mr. Huggins's due process claims arise under federal law.

4.     This Court has personal jurisdiction over Director Thornell because, on information and belief, he resides and holds office in Arizona.

5.     Venue in the District Court for the District of Arizona is proper under 28 U.S.C. § 1391(b)(1) and (c)(1) because, on information and belief, Director Thornell resides in this District. Venue in this District is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Mr. Huggins's claims occurred in this District.

### Allegations

**I.     In 1993, the Arizona Legislature generally abolished parole for adults who commit felony offenses and replaced it with community supervision.**

6.     In 1993, the Arizona Legislature "enacted its truth-in-sentencing law" and generally "eliminated parole for crimes committed on or after January 1, 1994." *Viramontes v. Att'y Gen.*, No. CV-16-00151, 2021 WL 977170, at *1 (D. Ariz. Mar. 16, 2021).

7.      The Legislature generally abolished parole by amending A.R.S. § 41-1604.09—a statute in Title 41 ("State Government"), Chapter 11 ("State Department of Corrections"), governing the ADCRR Director's duties in connection with prisoners' parole eligibility classifications and certifications—to add a negative inference that parole is unavailable for people who commit felony offenses on or after January 1, 1994. *See* A.R.S. § 41-1604.09(I)(1) ("This section applies to . . . [a] person who commits a felony offense before January 1, 1994.").

8.      The Legislature "replaced [parole] with a system of 'earned release credits'" and community supervision. *State v. Vera*, 235 Ariz. 571, 575 ¶ 17 (App. 2014) (citation omitted). Under this system, eligible prisoners can earn release credits, which generally allow prisoners to be released from prison "after serving approximately 85% of [their] sentence[s]." *State v. Coffelt*, No. 1 CA-CR 17-0303, 2018 WL 2976246, at *1 ¶ 6 n.3 (Ariz. Ct. App. June 14, 2018); *see also, e.g.*, *State v. Rosario*, 195 Ariz. 264, 268 ¶ 26 (App. 1999) (similar); A.R.S. § 41-1604.07(B) (setting earned release credit amounts depending on the offenses committed).

9.      When a prisoner who committed a felony offense reaches the "earned release date" (for a prisoner who earns enough release credits) or "sentence expiration date" (for a prisoner who serves the full imprisonment term), the ADCRR Director must generally "release[]" the prisoner to serve a community supervision term, A.R.S. § 41-1604.07(E), or any consecutive sentence. A.R.S. § 41-1604.07(J). [*See also* **Exhibit A** (ADCRR Department Order 1002: Inmate Release Eligibility System Excerpts) at 10 (§ 1.15.4) ("Inmates with a date of offense on/after January 1, 1994 shall be released on the SED [*i.e.*, the sentence expiration date] to begin serving the Community Supervision term imposed by the court or begin serving any consecutive sentence imposed."), at 44 (§ 8.12.9) ("An inmate, with a date of offense on or after January 1, 1994, who has reached the ERCD [*i.e.*, the earned release credit date], shall be released to begin Community Supervision or begin serving any consecutive sentence imposed.")][1]

---

[1] ADCRR's policies are also available online <u>here</u>.

10.     "Community supervision" is that "portion of a felony sentence" that is "served in the community after completing a period of imprisonment or served in prison in accordance with § 41-1604.07." A.R.S. § 13-105(5). Under A.R.S. § 13-603(I), a community supervision term "shall be for a period equal to one day for every seven days" of the sentence imposed and "shall be served consecutively to the actual period of imprisonment."

11.     The Legislature's purpose in generally abolishing parole and replacing it with community supervision was, in part, to "provide some form of supervision after release for <u>all</u> prisoners and to help ease their return to society." Cami Byrd, Criminal Code Revision, 26 Ariz. St. L.J. 341, 344 (1994) (emphasis added). This contrasts with the previous system under which certain offenders who were ineligible for parole and other early release programs could "re-enter society without any supervision upon completion of their sentence[s]." *Id.* at 344 n.18.

12.     While earned release credits and community supervision straightforwardly apply to determinate sentences, they have "no ready application" to "indeterminate life sentence[s]." *Vera*, 235 Ariz. at 575 ¶ 17 & n.8. For this reason, ADCRR admitted that the difference between parole and community supervision is mere "semantics" as applied to life sentences. [**Exhibit B** (Deposition of Herbert Haley, Jr.) at 10:1-10:8, 72:13-75:9, 130:8-130:25; *see also* **Exhibit C** (Deposition of ADCRR) at 62:11-65:12 (similar; for life sentences, "the reality is the parole is the community supervision"; for these sentences, ADCRR treats them as "one and the same")]

## II.     Confusion about parole availability pervaded Arizona's judicial system for decades.

13.     Although the Legislature amended a statute in Title 41 to "provide that an adult who commits a felony offense is generally ineligible for parole," *State v. Anderson*, 257 Ariz. 226, 229 ¶ 3 (2024) (citing A.R.S. § 41-1604.09(I)), it retained references to parole in Title 13 ("Criminal Code") as a potential form of "release" for prisoners in ADCRR's custody. *See, e.g.*, A.R.S. § 13-4401(14) ("'Post-conviction release' means parole, work furlough, community supervision, probation . . . , home arrest or any other permanent, conditional or temporary discharge from confinement in the custody of [ADCRR] . . ."). It also later added references to

parole in other statutes in Title 41 that imply the same point. *See, e.g.*, A.R.S. § 41-1604.08(A) (ADCRR "shall assign any person who is in [ADCRR's custody] and who was convicted of a violation of § 13-705 to a global position monitoring system on the person's release on parole, community supervision, work release or other conditional or temporary release"). And the Arizona Board of Executive Clemency ("ABOEC") likewise retained references to parole in its policies for a similar purpose. [*See* **Exhibit D** (Ariz. Admin. Code Title 5, Chapter 4, R5-4-101(8)) ("'Release' means parole, home arrest, work furlough, or community supervision.")][2]

14.    These inconsistencies produced "pervasive confusion" for decades by "both bench and bar about parole availability after it was abolished in Arizona." *Anderson*, 257 Ariz. at 229 ¶ 2. This "systemic failure to recognize the effect of the change in the law regarding parole" manifested in trial and appellate courts throughout the State. *Id.* at 232 ¶ 25.

15.    Trial courts since 1994 "interchangeably used the words 'parole' and 'release' when imposing non-natural-life sentences." *Id.* at 231 ¶ 17. This is evidenced by the below facts relating to the case records for individuals in Arizona who were convicted of first-degree murder or conspiracy to commit first-degree murder for conduct occurring on or after January 1, 1994. (The first-degree murder sentencing statute in Title 13 refers to parole. It also authorizes sentencing courts to impose non-natural-life sentences. *See* A.R.S. § 13-751.)

a.    Of the 607 cases involving non-natural-life sentences imposed on individuals for conduct that occurred on or after January 1, 1994, in which sentencing minute entries/orders were obtained, 47% of the minute entries/orders include the word "parole," 28% include the word "release," 22% contain neither of the words "release" or "parole," and 3% contain both "release" and "parole." [**Exhibit E** (Declaration of Shawnee Rae Ziegler) ¶ 7]

b.    Of the 416 cases involving non-natural-life sentences imposed on individuals for conduct that occurred on or after January 1, 1994, in which sentencing transcripts

---

[2] ABOEC's policies are also available online here.

were obtained, 38% of the transcripts use the word "parole," 40% use the word "release," 14% use neither of the words "release" or "parole," and 8% use both "release" and "parole." [*Id.* ¶ 8]

       c.    In 35% of these cases involving non-natural-life sentences imposed on individuals for conduct that occurred on or after January 1, 1994, the language used (*i.e.*, "release," "parole," neither word, or both words) in the sentencing minute entry/order does not match the language used in the sentencing transcript. [*Id.* ¶ 9]

       d.    In 71% of these cases involving non-natural-life sentences imposed on individuals for conduct that occurred on or after January 1, 1994, community supervision was imposed as part of the sentence. [*Id.* ¶ 10]

       e.    Zero (0) of the sentencing minute entries/orders reviewed, across all Arizona counties, refer to A.R.S. § 41-1604.09. [*Id.* ¶ 11] By contrast, 98% of the sentencing minute entries/orders reviewed refer to the relevant substantive criminal sentencing statute contained in Title 13. [*Id.* ¶ 12]

       16.    Appellate courts, too, published a host of decisions stating that "parole was still available for those convicted of felonies with the possibility of release" after serving 25 years in prison. *Anderson*, 257 Ariz. at 231 ¶ 17. Examples abound. *See, e.g.*, *State v. Benson*, 232 Ariz. 452, 465 ¶ 56 (2013) ("Arizona law does not make [the defendant] ineligible for parole."); *State v. Garcia*, 224 Ariz. 1, 18 ¶ 77 (2010) (There was no *Simmons* violation because, "irrespective of any likelihood that he would die in prison, [the defendant] was not technically ineligible for parole."); *State v. Cruz*, 218 Ariz. 149, 160 ¶ 42 (2008) ("No state law would have prohibited [the defendant's] release on parole after serving [25] years, had he been given a life sentence."); *State v. Fell*, 209 Ariz. 77, 78 ¶ 1 (App. 2004) (Because the State had "withdrawn its previously filed notice of intent to seek the death penalty, the remaining sentencing options were a natural life prison term or a life term with the possibility of parole after [25] years."); *State v. Ring*, 200 Ariz. 267, 279 ¶ 42 (2001) ("The range of punishment allowed [for a first-degree murder offense] on the basis of the verdict alone is life imprisonment with the possibility of parole or

imprisonment for 'natural life' without the possibility of release."); *State v. Wagner*, 194 Ariz. 310, 313 ¶ 11 (1999) (Arizona's first-degree murder sentencing statute "states with clarity that the punishment for committing first degree murder is either death, natural life, or life in prison with the possibility of parole"); *State v. Ovind*, 186 Ariz. 475, 478 (App. 1996) (A "person convicted of first degree murder shall suffer death, imprisonment for natural life, or imprisonment for [25] . . . calendar years without possibility of commutation or parole.").

17.    The "Arizona reporter is [thus] full of cases in which the sentencing judge mistakenly thought that he or she had discretion to allow parole." *Jessup v. Shinn*, 31 F.4th 1262, 1267 n.1 (9th Cir. 2022) (citing *Chaparro v. Shinn*, 248 Ariz. 138, 139 ¶ 1 (2020); *Vera*, 235 Ariz. at 572 ¶ 2); *see also, e.g.*, *Viramontes*, 2021 WL 977170, at *1 ("Despite the elimination of parole, prosecutors continued to offer parole in plea agreements, and judges continued to accept such agreements and impose sentences of life with the possibility of parole.").

18.    And "ADCRR policies as recently as 2021 were unclear about whether" prisoners sentenced to non-natural-life sentences for conduct that occurred on or after January 1, 1994, were "eligible for parole." *Anderson*, 257 Ariz. at 231 ¶ 17.

**III.    Mr. Huggins was sentenced on Count 2 to "life with no release until [he] has served 25 years" in prison "unless [his] sentence is commuted" followed by a community supervision term and received a consecutive sentence on Count 7.**

19.    In or around April 1997, Mr. Huggins was convicted by a jury of various drug-related offenses for events that occurred in 1995. He was convicted of (1) possession of a dangerous drug for sale (methamphetamine), (2) transportation of a dangerous drug for sale (methamphetamine), (3) possession of a narcotic drug (cocaine), (4) transfer of a narcotic drug (cocaine), (5) participation in a criminal syndicate, and (6) manslaughter. The relevant convictions are for transfer of a narcotic drug ("Count 2") and manslaughter ("Count 7").

20.    The Gila County Probation Department prepared a presentence report for Mr. Huggins's sentencing. It recommended that, for most counts, Mr. Huggins be ordered to serve

"the presumptive term[s]" of imprisonment. For Count 2, it recommended that Mr. Huggins be ordered to serve "the term of 25 years" in prison. [**Exhibit F** (Presentence Report) at 6]

21. The Gila County Superior Court then sentenced Mr. Huggins. Under Count 2, the Court entered this sentence: "DEPARTMENT OF CORRECTIONS, LIFE WITH NO RELEASE UNTIL Defendant HAS SERVED 25 YEARS, unless sentence is commuted." [**Exhibit G** (Sentence of Imprisonment) at 4; *see also* **Exhibit H** (Sentencing Transcript) at 18 ("[P]ursuant to Arizona law[,] you are sentence[d] to serve a term of life in prison. You are not eligible for release on any basis until you have served 25 years unless your sentence is commuted.")] And under Count 7, the Court entered this sentence: "DEPARTMENT OF CORRECTIONS, 5 YEARS, PRISON." [**Exhibit G** at 6; *see also* **Exhibit H** at 20 (similar)]

22. The Court also ordered "AS TO EACH SENTENCE":

a. "COMMUNITY SUPERVISION: IT IS ORDERED that after Defendant is released from custody he will be subject to community supervision for a period of time as set forth in A.R.S. §§13-603(I)." [**Exhibit G** at 6]

b. "PAYMENT OF FINES: IT IS HEREBY ORDERED that the Defendant make payments on the fines ordered herein in regular monthly installments of $100.00, commencing on the first day of the second month after his release from the Department of Corrections, and on the first day of each month thereafter until paid in full." [*Id.*]

c. "IT IS ORDERED that the Defendant shall avoid contact with or use of illegal drugs, dangerous drugs and narcotics except those prescribed by a physician. The Defendant shall not possess drugs on his person, nor in his vehicle or home, and shall submit to drug testing as directed." [*Id.*]

d. "FURTHER ORDERED the Gila County Sheriff and/or the Arizona Department of Corrections is directed to notify the Clerk of the Superior Court of Gila County of the Defendant's release date from secured custody; and of the Defendant's mailing address at time of release from secured custody; and further, should the Defendant move, he is directed to

notify the Clerk of the Court, 1400 East Ash Street, Globe, AZ 85501, within ten (10) days of the Defendant's change of address." [*Id.* at 7]

23.     The Court ordered that the sentence for Count 7 (a five-year imprisonment term followed by a community supervision term) runs consecutively to the sentences for Count 2 ("life with no release until [Mr. Huggins] has served 25 years" in prison "unless [his] sentence is commuted" followed by a community supervision term) and the other counts. [*Id.* at 6][3]

24.     Having sentenced Mr. Huggins as it believed that "the law require[d]," the Court expressed its opinion under A.R.S. § 13-603(K) (now codified at A.R.S. § 13-603(L)) that Mr. Huggins's sentence under Count 2 is "clearly excessive." [*Id.* at 4-5] The Court provided its "specific reasons for concluding that a sentence of life imprisonment without release until [Mr. Huggins] has served [25] years [in prison] is clearly excessive" in a special order to ABOEC. [**Exhibit I** (Special Findings Per A.R.S. § 13-603(K)) at 1] The Court emphasized, among other things, that (a) jurors believed that Mr. Huggins's conduct, as compared to other individuals' conduct, "was the same or similar[,] yet his sentence is grossly more harsh"; (b) many witnesses at trial were Mr. Huggins's "immediate associates who also dealt in drugs," and "they universally received guarantees of probation (or less) or a judge with sentencing discretion granted them probation"; and (c) Mr. Huggins's "lifestyle was the same or similar to that of the others who, at [Mr. Huggins's trial], admitted dealing drugs and who received probation or less." [*Id.*]

25.     Mr. Huggins appealed his convictions and sentences. The Arizona Court of Appeals affirmed. *See State v. Huggins*, No. 2 CA-CR 2008-0280, 2009 WL 765491, at *1 ¶ 1 (Ariz. Ct. App. Mar. 24, 2009) ("We affirmed Huggins's convictions and sentences on appeal."). And the Arizona Supreme Court denied Mr. Huggins's petition for review.

26.     The State did not appeal or cross-appeal on any issue.

---

[3] The convictions for the other counts are irrelevant because Mr. Huggins has served the imprisonment terms to which he was sentenced on those counts. [**Exhibit G** at 2-6]

27. Mr. Huggins petitioned for post-conviction relief multiple times. The Superior Court denied his claims, and the Arizona Court of Appeals affirmed. *See id.* ¶¶ 2, 13.

28. Mr. Huggins also petitioned for a writ of habeas corpus in Arizona state court. The Superior Court dismissed his petition, and the Arizona Court of Appeals affirmed. *See State v. Huggins*, No. 2 CA-CR 2014-0155, 2014 WL 3531281, at *1 ¶ 1 (Ariz. Ct. App. July 16, 2014).

**IV.    The Arizona Board of Executive Clemency repeatedly refused to recommend that the Governor commute Mr. Huggins's sentence on Count 2.**

29. The Gila County Superior Court's "special order" under A.R.S. § 13-603(K) (now codified at A.R.S. § 13-603(L)) allowed Mr. Huggins to petition ABOEC for a commutation on his sentence under Count 2 within 90 days from when he was committed to ADCRR's custody.

30. In or around July 1997, Mr. Huggins thus applied for a commutation on his sentence under Count 2. ABOEC denied Mr. Huggins's application.

31. In or around February 2016, Mr. Huggins again applied for a commutation on his sentence under Count 2. ABOEC held a Phase I hearing and passed Mr. Huggins's application to Phase II of its commutation process. But at the Phase II hearing, ABOEC questioned whether Mr. Huggins was in fact eligible for a commutation, suspended the hearing, and then determined that Mr. Huggins was "ineligible" for a commutation on his sentence under Count 2 until August 2023—*i.e.*, until he had served 25 years in prison on that sentence. [**Exhibit J** (ABOEC Aug. 4, 2016 Letter) at 1; *see also* **Exhibit K** (ABOEC Nov. 1, 2016 Letter) at 1 (ABOEC asserting that "you are not eligible for a commutation until you have served 25 years" in prison)]

32. ABOEC's interpretation that Mr. Huggins was ineligible for a commutation on his sentence under Count 2 until he had served 25 years in prison on that sentence is inconsistent with A.R.S. § 13-3410(B) and Mr. Huggins's sentence. Section 13-3410(B) says that a person "shall be sentenced to life imprisonment and is not eligible for suspension of sentence, probation, pardon or release from confinement on any basis until the person has served not less than [25] years [in prison] <u>or</u> the sentence is commuted." (Emphasis added). So too, Mr. Huggins was sentenced on Count 2 to "life with no release until [he] has served 25 years" in prison "<u>unless</u>

[his] sentence is commuted." [**Exhibit G** at 4 (emphasis added)] Both made Mr. Huggins eligible for commutation before he served 25 years in prison.

33.    In or around September 2023, Mr. Huggins yet again applied for a commutation on his sentence under Count 2. Mr. Huggins stressed, among other things, that (a) he used drugs for only about 2.5 years in his life (he is now 67 years old); (b) he has family members who would support him in the community, including his mother, sister, brother in law, grandson, and nephew; (c) he learned trades in prison, including concrete and painting, that he could apply to earn income; and (d) he has had no disciplinary violations since 2005. ABOEC yet again denied Mr. Huggins's application, refusing to even pass it to a Phase II hearing. It did so in an ex parte hearing in which Mr. Huggins could not participate that lasted less than four minutes.

**V.    Mr. Huggins is eligible for parole or entitled to community supervision on Count 2.**

34.    Mr. Huggins was sentenced on Count 2 as a serious drug offender under A.R.S. § 13-3410(B) to "life with no release until [he] has served 25 years" in prison "unless [his] sentence is commuted" followed by a community supervision term. [**Exhibit G** at 4, 6]

35.    Mr. Huggins started serving his sentence on Count 2 on September 1, 1998. [**Exhibit L** (ADCRR ACIS Inmate Record) at 1 (showing a "Sent. Begin" date as "09/01/1998")] He has therefore served over 25 years in prison under Count 2.

36.    Under Arizona law, Mr. Huggins is eligible for parole on Count 2 or, in the alternative, entitled to community supervision. Both parole and community supervision are forms of "release" under A.R.S. § 13-3410(B) and Mr. Huggins's sentence of imprisonment.

**A.    Section 13-3410(B) authorizes Mr. Huggins's release on parole or, in the alternative, requires his release on community supervision.**

37.    Mr. Huggins was sentenced on Count 2 under A.R.S. § 13-3410(B). Section 13-3410(B) "enhance[s] the sentence resulting from conviction for certain enumerated drug offenses." *State v. Nichols*, 201 Ariz. 234, 237 ¶ 12 (App. 2001). When it applies, it provides that a person "shall be sentenced to life imprisonment and is not eligible for suspension of

1    sentence, probation, pardon or release from confinement on any basis until the person has served

2    not less than [25] years [in prison] or the sentence is commuted." A.R.S. § 13-3410(B).

3        38.    The Gila County Superior Court sentenced Mr. Huggins on Count 2 to "life with

4    no release until [he] has served 25 years" in prison "unless [his] sentence is commuted" followed

5    by a community supervision term. [**Exhibit G** at 4, 6; *see also* **Exhibit H** at 18 (similar)]

6        39.    Mr. Huggins has served over 25 years in prison under Count 2. [**Exhibit L** at 1]

7        40.    Mr. Huggins is thus eligible for "release" under A.R.S. § 13-3410(B).

8        41.    When this Court interprets a state statute, it must "appl[y] [that] state's rules of

9    statutory construction." *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 746

10   (9th Cir. 2013). In applying those rules, this Court can also "consult how a state court" interprets

11   "its own State's laws" because of the "respect due state courts as the final arbiters of state law

12   in our federal system." *United States v. Taylor*, 596 U.S. 845, 859 (2022).

13       42.    Applying Arizona's statutory interpretation principles, Mr. Huggins is eligible for

14   parole on Count 2 or, in the alternative, entitled to community supervision. That's because parole

15   and community supervision are forms of "release" under A.R.S. § 13-3410(B).

16       a.    <u>First</u>, when a statute's "plain language" is "clear and unambiguous,"

17   Arizona courts "give effect to that language without employing other rules of statutory

18   construction." *Parsons v. Ariz. Dep't of Health Servs.*, 242 Ariz. 320, 323 ¶ 11 (App. 2017).

19   "Absent a statutory definition, courts generally give words their ordinary meaning and may look

20   to dictionary definitions." *In re Drummond*, 257 Ariz. 15, 18 ¶ 7 (2024). Here, "release" in

21   A.R.S. § 13-3410(B) is undefined, but its ordinary meaning is broad: "The action of freeing or

22   the fact of being freed from restraint or confinement." *Release*, Black's Law Dictionary (12th

23   ed. 2024). This Court should thus interpret "release" as a general term meaning discharge from

24   imprisonment, including more specific terms like parole and community supervision.

25       b.    <u>Second</u>, this reading is reinforced by the "context" in which "release"

26   appears. *Glazer v. State*, 244 Ariz. 612, 614 ¶ 10 (2018) (citation omitted). "Release" is a catch-

1  all term at the end of a list, following "suspension of sentence, probation, [and] pardon." A.R.S.

2  § 13-3410(B). Words "grouped in a list should be given related meanings." *State ex rel. Brnovich*

3  *v. City of Phoenix*, 249 Ariz. 239, 245 ¶ 23 (2020) (citation omitted). This Court should thus

4  interpret "release" in A.R.S. § 13-3410(B) broadly to cover any unlisted supervised release forms

5  that are like the listed term "probation" (including parole and community supervision) and any

6  unlisted forms of executive clemency that are like the listed term "pardon." This interpretation

7  honors the principle requiring courts to give meaning to "every word and provision so that no

8  word or provision is rendered superfluous." *Nicaise v. Sundaram*, 245 Ariz. 566, 568 ¶ 11 (2019).

9      c.    Third, Arizona courts consider "statutes that are *in pari materia*—of the

10  same subject or general purpose." *Stambaugh v. Killian*, 242 Ariz. 508, 509 ¶ 7 (2017). Here,

11  other statutes define "release" broadly to cover parole and community supervision. *See, e.g.*,

12  A.R.S. § 13-4401(14) ("'Post-conviction release' means parole, work furlough, community

13  supervision, probation . . . , home arrest or any other permanent, conditional or temporary

14  discharge from confinement in the custody of [ADCRR] . . ."); A.R.S. § 41-1604.08(A)

15  (ADCRR "shall assign any person who is in [ADCRR's custody] and who was convicted of a

16  violation of § 13-705 to a global position monitoring system on the person's release on parole,

17  community supervision, work release or other conditional or temporary release."). ABOEC

18  policies adopt a similar interpretation. [**Exhibit D** (Ariz. Admin. Code Title 5, Chapter 4, R5-4-

19  101(8)) ("'Release' means parole, home arrest, work furlough, or community supervision.")]

20      d.    Fourth, although the Legislature generally abolished parole in 1993 by

21  amending A.R.S. § 41-1604.09, interpreting "release" in A.R.S. § 13-3410(B) to exclude parole

22  would make that statute "unintelligible." *State ex rel. Brnovich*, 249 Ariz. at 247 ¶ 35. "Release"

23  in A.R.S. § 13-3410(B) cannot include only forms of executive clemency or that word would be

24  meaningless. Section 13-3410(B) provides that a person is ineligible for "release from

25  confinement on any basis until the person has served not less than [25] years [in prison] or the

26  sentence is commuted." The clause "or the sentence is commuted" implies that the prisoner is

eligible for commutation before serving 25 years in prison. (Emphasis added). So, upon serving 25 years in prison, "release" must mean some mechanism besides "commutation." Nor can "release" in A.R.S. § 13-3410(B) only mean "pardon." Section 13-3410(B) separately lists a "pardon" as a form of release that a person is ineligible to receive for 25 years. For the word "release" to have meaning, it must include some mechanism besides "pardon." Parole and community supervision are the only other mechanisms available. To interpret the statute otherwise would empty "release" of any meaning, rendering it "superfluous." *Nicaise*, 245 Ariz. at 568 ¶ 11. Section 13-3410(B)—as a "specific statute[]"—thus "control[s] over" A.R.S. § 41-1604.09—as a "general statute[.]" *Mercy Healthcare Ariz., Inc. v. Ariz. Health Care Cost Containment Sys.*, 181 Ariz. 95, 100 (App. 1994). But even if A.R.S. § 41-1604.09 excluded parole as a form of "release," it would not exclude community supervision. After all, the Legislature's purpose in establishing community supervision was to "provide some form of supervision after release for <u>all</u> prisoners." Cami Byrd, Criminal Code Revision, 26 Ariz. St. L.J. 341, 344 (1994) (emphasis added). And ADCRR admitted that it treats parole and community supervision as "one and the same" as applied to life sentences because any difference is mere "semantics." [**Exhibit B** at 10:1-10:8, 72:13-75:9, 130:8-130:25; **Exhibit C** at 62:11-65:12]

e.      <u>Fifth</u>, Arizona courts evaluate a proposed statutory interpretation's "effects and consequences." *Premier Physicians Grp., PLLC v. Navarro*, 240 Ariz. 193, 195 ¶ 9 (2016). Interpreting "release" in A.R.S. § 13-3410(B) to include parole and community supervision, not only forms of executive clemency, would provide prisoners with a meaningful chance at release.

i.      The criteria for parole are significantly different than those for commutation. A prisoner eligible for parole needs to show that "there is a substantial probability that the applicant will remain at liberty without violating the law and that the release is in the best interests of the state." A.R.S. § 31-412(A). An applicant seeking commutation, on the other hand, must show that there is "a substantial probability that when released the offender will conform the offender's

conduct to the requirements of the law" and that there is "clear and convincing evidence that the sentence imposed is clearly excessive." A.R.S. § 31-402(C)(2).

ii.     Decisions to grant or deny parole are made by ABOEC without any review by the Governor. *See* A.R.S. § 31-412(A). For commutation, though, final decisions are made by the Governor—only after ABOEC first recommends it (after completing its own two-step process). *See* A.R.S. § 31-402(A), (C).

iii.     Prisoners who are denied release on parole at the end of a parole hearing are automatically re-certified within six months to one year. *See* A.R.S. § 41-1604.09(D), (G). But prisoners who are denied commutation must usually wait five to ten years before applying again. *See* A.R.S. § 31-403(A)–(C).

iv.     The differences between parole and commutation have, not surprisingly, produced drastically disparate release rates. According to ABOEC's 2024 report, ABOEC conducted 240 hearings for prisoners who were eligible for parole under A.R.S. § 31-412(A) and granted relief in 78 cases (~32.5%). [**Exhibit M** (ABOEC 2024 Report) at 13] ABOEC also conducted 75 hearings for prisoners who were eligible for parole under A.R.S. § 31-412(B) and granted relief in 14 cases (~18.67%). [*Id.*] In comparison, while ABOEC conducted 199 commutation Phase I hearings and 11 commutation Phase II hearings,[4] the Governor granted only six commutations. [*Id.* at 14] The six commutation grants from the 204 prisoners who had commutation hearings produced a commutation grant rate of ~2.9%. [*Id.*] *See also, e.g., Graham v. Florida*, 560 U.S. 48, 70 (2010) (describing executive clemency as a "remote possibility"); *Solem v. Helm*, 463 U.S. 277, 303 (1983) (similar); *Viramontes*, 2021 WL 977170, at *2 ("Unlike parole, the chances

---

[4] The 11 commutation Phase II hearings included five hearings in which a Phase I hearing was not held because of the nature of the commutation request (namely, Imminent Danger of Death Commutation or 603(L) Commutation). [**Exhibit M** at 14]

1   of obtaining release through executive clemency are slim."); *id.* at *2 n.2 (citing

2   2013 statistics in which parole was granted in about 24% of cases while

3   commutation was granted in about 0.005% of cases).

4           v.      Prisoners eligible to be released on community supervision also have

5   a meaningful chance at release. When a prisoner reaches the "earned release date"

6   (for a prisoner who earns enough release credits) or "sentence expiration date" (for

7   a prisoner who serves the full imprisonment term), the ADCRR Director must

8   "release[]" the prisoner to serve a community supervision term unless (a) the

9   prisoner refuses to "agree to abide by the conditions of supervision," (b) the

10  prisoner "fails to achieve functional literacy at an eighth grade literacy level," or

11  (c) the ADCRR Director believes that the prisoner "may be a sexually violent

12  person." A.R.S. § 41-1604.07(E), (F), (I). When a prisoner has a consecutive

13  sentence, the ADCRR Director must "release" the prisoner to serve that sentence,

14  though the Director may rescind "the release to any consecutive term if the

15  prisoner fails to adhere" to ADCRR's rules. A.R.S. § 41-1604.07(J).

16          f.      Sixth, Arizona courts interpret statutes to "avoid constitutional difficulties"

17  and "serious constitutional questions." *State v. Gomez*, 212 Ariz. 55, 60 ¶ 28 (2006). Under the

18  void-for-vagueness doctrine, the Government violates the Fourteenth Amendment's Due Process

19  Clause when it takes away "someone's life, liberty, or property under a criminal law so vague

20  that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that

21  it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). "These

22  principles apply not only to statutes defining elements of crimes, but also to statutes fixing

23  sentences." *Id.* at 596. Here, interpreting "release" in A.R.S. § 13-3410(B) broadly to include

24  parole and community supervision avoids constitutional difficulties. Conversely, a narrow

25  interpretation limiting "release" to only forms of executive clemency would raise serious

26  constitutional questions and difficulties under the void-for-vagueness doctrine because A.R.S. §

13-3410(B) would have failed to provide fair notice of its potential punishments. That's all the more true given the widespread confusion about the forms of release available to prisoners like Mr. Huggins sentenced to non-natural-life sentences, as explained above (¶¶ 6-18). *See also, e.g.*, *Johnson*, 576 U.S. at 598-602 (the Armed Career Criminal Act's residual clause, under which a person could be sentenced to "prison for 15 years to life," is unconstitutionally vague because, among other things, it produces "more unpredictability and arbitrariness than the Due Process Clause tolerates," as shown by the "pervasive disagreement" among federal courts about its meaning); *Isaacson v. Brnovich*, 610 F. Supp. 3d 1243, 1254 (D. Ariz. 2022) (A.R.S. § 1-219 is unconstitutionally vague because a law that requires an "extraordinary effort to decipher fails to give ordinary people fair notice of the conduct it permits and proscribes" and that is especially so when "it is entirely unclear how to reconcile [the statute] with Arizona's existing laws").

g.    Seventh, the Arizona Court of Appeals has interpreted "release" in A.R.S. § 13-3410 to include parole. In *Nichols*, the Court upheld A.R.S. § 13-3410 in a constitutional challenge under *Apprendi*. 201 Ariz. at 235 ¶ 1. In doing so, the Court described the sentence enhancement under A.R.S. § 13-3410 as "life imprisonment with no possibility of parole for [25] years." *Id.* This is, at a minimum, "a datum for ascertaining state law" for purposes of A.R.S. § 13-3410. *Herrera v. Zumiez, Inc.*, 953 F.3d 1063, 1069 (9th Cir. 2020) (citation omitted).

h.    Eighth, Arizona courts apply the "rule of lenity" to resolve "any doubt about statutory construction . . . in favor of a [criminal] defendant." *State v. Story*, 206 Ariz. 47, 51 ¶ 15 (App. 2003); *see also, e.g.*, *Ovind*, 186 Ariz. at 478 (applying the rule of lenity). If the seven points above somehow do not definitively establish that "release" in A.R.S. § 13-3410(B) includes parole and community supervision, then this Court should apply the rule of lenity.

**B.    Mr. Huggins's sentence of imprisonment authorizes his release on parole or, in the alternative, requires his release on community supervision.**

43.    The Gila County Superior Court sentenced Mr. Huggins on Count 2 to "life with no release until [he] has served 25 years" in prison "unless [his] sentence is commuted" followed by a community supervision term. [**Exhibit G** at 4, 6; *see also* **Exhibit H** at 18 (similar)]

- 17 -

44.    Mr. Huggins has served over 25 years in prison under Count 2. [**Exhibit L** at 1]

45.    Mr. Huggins is thus eligible for "release" under his sentence of imprisonment.

46.    Arizona courts interpret "a criminal sentence with the goal of giving effect to the sentencing court's intent." *Chaparro*, 248 Ariz. at 140 ¶ 8. And now that the time for anyone to appeal Mr. Huggins's sentence on Count 2 has passed, that sentence is "final and enforceable"— meaning that courts lack jurisdiction to amend it. *Id.* at 142 ¶¶ 18, 19.

47.    Mr. Huggins is eligible for parole on Count 2 or, in the alternative, entitled to community supervision because parole and community supervision are forms of "release" under his sentence of imprisonment. It is evident that the Gila County Superior Court intended to confer parole eligibility on Mr. Huggins or, in the alternative, to grant him community supervision.

a.    <u>First</u>, the Court ordered "AS TO EACH SENTENCE," including the sentence on Count 2, that Mr. Huggins is "subject to community supervision for a period of time" set out in A.R.S. § 13-603(I). [**Exhibit G** at 6] The Court thus specified the form of "release" to which Mr. Huggins is entitled. The Court must have intended for Mr. Huggins to start serving his consecutive sentence on Count 7 after he served 25 years in prison on Count 2. *See* A.R.S. § 41-1604.07(J) (the ADCRR Director "shall authorize the release of any prisoner on the prisoner's earned release credit date to serve any consecutive term imposed on the prisoner."). Otherwise, the Court's community supervision order on Count 2 would be pointless.

b.    <u>Second</u>, the Court's other orders also show that the Court intended for "release" in the sentence on Count 2 to provide a meaningful chance at release through parole or community supervision. Mr. Huggins's duty to pay fines starts "on the first day of the second month after his release" from ADCRR's custody. [**Exhibit G** at 6] In ordering Mr. Huggins to avoid illegal drugs, the Court said that Mr. Huggins cannot possess drugs "on his person, nor in his vehicle or home." [*Id.*] This tracks the Court's statements at Mr. Huggins's sentencing. There, the Court explained: "When you are released, you will not be permitted to use drugs unless authorized by a physician." [**Exhibit H** at 18] And the Court directed ADCRR to notify the Clerk

of the Court of Mr. Huggins's "release date" and "mailing address." [**Exhibit G** at 7] If Mr. Huggins moves, then he must notify the Clerk of his "change of address." [*Id.*] Every one of these orders contemplates that Mr. Huggins will (not may) be released from ADCRR's custody. In contrast, there is no evidence—none—that the Court intended for "release" in the sentence on Count 2 to include only "an ad hoc exercise of executive clemency." *Solem*, 463 U.S. at 301.

c.    <u>Third</u>, this interpretation is bolstered by the Probation Department's presentence report. That report recommended that Mr. Huggins be ordered to serve "the term of 25 years" in prison on Count 2. [**Exhibit F** at 6] Again: That would allow Mr. Huggins to start serving his consecutive sentence on Count 7 after he served 25 years in prison on Count 2.

d.    <u>Fourth</u>, when the Court sentenced Mr. Huggins, and for many years after, Arizona courts regularly "interchangeably used the words 'parole' and 'release' when imposing non-natural-life sentences." *Anderson*, 257 Ariz. at 231 ¶ 17. This reflected their belief that the words meant the same thing. Especially given the evidence above, the Court must have intended for "release" in the sentence on Count 2 to include parole and community supervision, so that Mr. Huggins would have a meaningful chance at release. *See, e.g.*, *Viramontes v. Ryan*, No. CV-16-00151, 2019 WL 568944, at *8 n.9 (D. Ariz. Feb. 12, 2019) ("It is immaterial that [the defendant] was sentenced to life with the possibility of 'release,' whereas the defendants in *Anderson* and *Shine* were sentenced to life with the possibility of 'parole.' As explained in this Order, the record strongly indicates the trial court believed that the sentence imposed carried parole eligibility after 25 years. That some defendants (like those in *Anderson* and *Shine*) received 'parole' sentences while others (like [the defendant]) received 'release' sentences shows only that the synonymizing of 'parole' with 'release' was a common error.").

48.    To sum up, Mr. Huggins is eligible for parole on Count 2 or, in the alternative, entitled to community supervision. Both parole and community supervision are forms of "release" under A.R.S. § 13-3410(B) and Mr. Huggins's sentence of imprisonment.

1    49.    ADCRR admitted that the difference between parole and community supervision

2    is mere "semantics" as applied to life sentences. [**Exhibit B** at 10:1-10:8, 72:13-75:9, 130:8-

3    130:25; *see also* **Exhibit C** at 62:11-65:12 (similar; for life sentences, "the reality is the parole

4    is the community supervision"; for these sentences, ADCRR treats them as "one and the same")]

5    **VI.    Despite Mr. Huggins's requests, Director Thornell refuses to certify Mr. Huggins as
        eligible for parole and refuses to implement his entitlement to community**

6    **supervision on Count 2, preventing him from serving his sentence on Count 7.**

7    50.    The Gila County Superior Court ordered that Mr. Huggins's sentence for Count 7

8    (a five-year imprisonment term followed by a community supervision term) runs consecutively

9    to the sentence for Count 2 ("life with no release until [Mr. Huggins] has served 25 years" in

10   prison "unless [his] sentence is commuted" followed by a community supervision term).

11   [**Exhibit G** at 6] Mr. Huggins has served over 25 years in prison under his sentence on Count 2.

12   51.    Director Thornell has certified Mr. Huggins as eligible for commutation. To date,

13   ABOEC has not recommended that the Governor commute Mr. Huggins's sentence on Count 2,

14   and the Governor has therefore not commuted Mr. Huggins's sentence on Count 2.

15   52.    Section 41-1604.09(D) provides that the ADCRR Director "shall certify as eligible

16   for parole any prisoner classified within an eligible classification five months immediately

17   before the prisoner's earliest parole eligibility."

18   53.    Mr. Huggins has already served a longer term in prison than his earliest parole

19   eligibility on Count 2. Mr. Huggins requested that Director Thornell certify him as eligible for

20   parole. [**Exhibit N** (Mr. Huggins's Counsel Correspondence with Director Thornell's Counsel)

21   at 1] He provided Director Thornell "a reasonable amount of time for Director Thornell to

22   consider this request." [*Id.*] Yet Director Thornell refuses to certify Mr. Huggins as eligible for

23   parole. [*Id.*] ABOEC has thus not scheduled a hearing at which it would decide whether to grant

24   Mr. Huggins parole on Count 2, so he can serve his consecutive sentence on Count 7.

25

26

54.     Section 41-1604.07(J) provides that the ADCRR Director "shall authorize the release of any prisoner on the prisoner's earned release credit date to serve any consecutive term imposed on the prisoner."

55.     According to ADCRR's records, Mr. Huggins's earned release credit date (as well as his sentence expiration date) on Count 2 is "life." [**Exhibit L** at 1] Mr. Huggins requested that Director Thornell implement his entitlement to community supervision. [**Exhibit N** at 1] He provided Director Thornell "a reasonable amount of time for Director Thornell to consider this request." [*Id.*] Yet Director Thornell refuses to implement Mr. Huggins's entitlement to community supervision. [*Id.*] Although Mr. Huggins has served over 25 years in prison on Count 2, Director Thornell will not allow him to serve his consecutive sentence on Count 7.

56.     Director Thornell's refusal to certify Mr. Huggins as eligible for parole and implement his entitlement to community supervision violates Mr. Huggins's due process rights.

### Count I
### (Procedural Due Process)

57.     Mr. Huggins incorporates all the above paragraphs.

58.     Director Thornell is a "person" under 42 U.S.C. § 1983.

59.     At all relevant times, Director Thornell acted under color of state law.

60.     The Gila County Superior Court sentenced Mr. Huggins on Count 2 to "life with no release until [he] has served 25 years" in prison "unless [his] sentence is commuted" followed by a community supervision term. [**Exhibit G** at 4, 6; *see also* **Exhibit H** at 18 (similar)]

61.     The Gila County Superior Court ordered that Mr. Huggins's sentence for Count 7 runs consecutively to the sentence for Count 2. [**Exhibit G** at 6]

62.     Mr. Huggins has served over 25 years in prison under his sentence on Count 2.

63.     Mr. Huggins has a constitutionally protected liberty interest in freedom from detention. This interest applies when Director Thornell interprets and implements Mr. Huggins's final criminal sentence imposed by a court. *See, e.g.*, *Francis v. Fiacco*, 942 F.3d 126, 141-42

1    (2d Cir. 2019) ("The general liberty interest in freedom from detention is perhaps the most
2    fundamental interest that the Due Process Clause protects. . . . It follows naturally that a
3    prisoner's liberty interest in freedom from detention implicates the Due Process Clause not only
4    when a jury convicts him or when a court initially sentences him, but also when prison officials
5    interpret and implement the sentence that the trial court has imposed.").

6    64.    Mr. Huggins has a constitutionally protected liberty or property interest in having
7    Director Thornell certify him as eligible for parole on Count 2. *See* A.R.S. § 41-1604.09(D) (the
8    ADCRR Director "shall certify as eligible for parole any prisoner classified within an eligible
9    classification five months immediately before the prisoner's earliest parole eligibility."); *see*
10   *also, e.g.*, *Bd. of Pardons v. Allen*, 482 U.S. 369, 377-81 (1987) (Montana's parole statutes
11   created "a liberty interest protected by the Due Process Clause"); *Greenholtz v. Inmates of Neb.*
12   *Penal & Corr. Complex*, 442 U.S. 1, 11-21 (1979) (same for Nebraska); *Stewart v. Ariz. Bd. of*
13   *Pardons & Paroles*, 156 Ariz. 538, 542-43 (App. 1988) (same for Arizona).

14   65.    Mr. Huggins has a constitutionally protected liberty or property interest in having
15   Director Thornell implement his entitlement to community supervision on Count 2. *See* A.R.S.
16   § 41-1604.07(J) (the ADCRR Director "shall authorize the release of any prisoner on the
17   prisoner's earned release credit date to serve any consecutive term imposed on the prisoner.");
18   *see also, e.g.*, *Allen*, 482 U.S. at 377-81; *Greenholtz*, 442 U.S. at 11-21; *Haygood v. Younger*,
19   769 F.2d 1350, 1355 (9th Cir. 1985) ("[W]hen the state itself creates a statutory right to release
20   from prison, the state also creates a liberty interest and must follow minimum due process
21   appropriate to the circumstances to ensure that liberty is not arbitrarily abrogated.").

22   66.    Director Thornell is depriving Mr. Huggins of his constitutionally protected liberty
23   or property interests with no process.

24   67.    Despite Mr. Huggins's reasonable requests, Director Thornell refuses to certify
25   Mr. Huggins as eligible for parole and refuses to implement his entitlement to community
26   supervision on Count 2, preventing him from serving his consecutive sentence on Count 7.

68.     Director Thornell is thus proximately causing a violation of Mr. Huggins's rights under the Fourteenth Amendment's Due Process Clause. *See, e.g.*, *Francis*, 942 F.3d at 141-47 (prison officials violated the Due Process Clause by "declining to implement one aspect of a sentence on the ground that state law did not authorize it," and so the prisoner's "sentence as implemented by the [prison officials] diverged from the sentence originally pronounced by the sentencing court"; "the Due Process Clause required them to provide certain procedural protections to safeguard [the prisoner's] liberty interest in avoiding future incarceration"); *Haygood*, 769 F.2d at 1355-58 (a prisoner stated a due process claim when prison officials, "through established interpretations of the regulations for setting release dates, without affording [the prisoner] an opportunity to be heard, chose to extend his custodial date" past his "correct release date"; they "knew that [the prisoner] was protesting his retention in custody," but simply and wrongly "believed that their understanding of the statutes was superior to his"); *Alexander v. Perrill*, 916 F.2d 1392, 1398 (9th Cir. 1990) (similar; "reaffirm[ing]" *Haygood*'s holding).

69.     There are no other constitutionally adequate remedies to address this violation.

### Count II
### (Substantive Due Process)

70.     Mr. Huggins incorporates all the above paragraphs.

71.     Director Thornell is a "person" under 42 U.S.C. § 1983.

72.     At all relevant times, Director Thornell acted under color of state law.

73.     The Gila County Superior Court sentenced Mr. Huggins on Count 2 to "life with no release until [he] has served 25 years" in prison "unless [his] sentence is commuted" followed by a community supervision term. [**Exhibit G** at 4, 6; *see also* **Exhibit H** at 18 (similar)]

74.     The Gila County Superior Court ordered that Mr. Huggins's sentence for Count 7 runs consecutively to the sentence for Count 2. [**Exhibit G** at 6]

75.     Mr. Huggins has served over 25 years in prison under his sentence on Count 2.

76.    Mr. Huggins has a constitutionally protected liberty interest in freedom from detention. This interest applies when Director Thornell interprets and implements Mr. Huggins's final criminal sentence imposed by a court. *See, e.g.*, *Francis*, 942 F.3d at 141-42.

77.    Mr. Huggins has a constitutionally protected liberty or property interest in having Director Thornell certify him as eligible for parole on Count 2. *See* A.R.S. § 41-1604.09(D) (the ADCRR Director "shall certify as eligible for parole any prisoner classified within an eligible classification five months immediately before the prisoner's earliest parole eligibility."); *see also Allen*, 482 U.S. at 377-81; *Greenholtz*, 442 U.S. at 11-21; *Stewart*, 156 Ariz. at 542-43.

78.    Mr. Huggins has a constitutionally protected liberty or property interest in having Director Thornell implement his entitlement to community supervision on Count 2. *See* A.R.S. § 41-1604.07(J) (the ADCRR Director "shall authorize the release of any prisoner on the prisoner's earned release credit date to serve any consecutive term imposed on the prisoner."); *see also Allen*, 482 U.S. at 377-81; *Greenholtz*, 442 U.S. at 11-21; *Haygood*, 769 F.2d at 1355.

79.    Despite Mr. Huggins's reasonable requests, Director Thornell refuses to certify Mr. Huggins as eligible for parole and refuses to implement his entitlement to community supervision on Count 2, preventing him from serving his consecutive sentence on Count 7.

80.    Director Thornell's conduct is arbitrary, unreasonable, unjustified, and deliberately indifferent to Mr. Huggins's due process rights. Director Thornell's conduct therefore shocks the conscience.

81.    Director Thornell is thus proximately causing a violation of Mr. Huggins's rights under the Fourteenth Amendment's Due Process Clause. *See, e.g.*, *Matzell v. Annucci*, 64 F.4th 425, 431-37 (2d Cir. 2023) (prison officials' decision to disqualify a prisoner from enrolling in a bootcamp program "diverged from the sentencing court's order" authorizing the prisoner's enrollment and thus the prisoner plausibly alleged a substantive due process violation; the prisoner also plausibly alleged that the prison officials' actions "rose to the level of deliberate indifference" because they "repeatedly refused" to enroll him into the program); *Barnes v. Dist.*

1   *of Columbia*, 793 F. Supp. 2d 260, 274-75 (D.D.C. 2011) (overdetention—*i.e.*, when a prisoner
2   is held in prison officials' custody even though he is "entitled to release" because of "a court
3   order, the expiration of a sentence, or otherwise"—can violate "the substantive component of
4   the Due Process Clause" by infringing on his "liberty interest in being free from incarceration").

<b>Prayer for Relief</b>

6        WHEREFORE, Mr. Huggins requests the following relief against Director Thornell:

7        A.    A declaration that Mr. Huggins is eligible for parole on Count 2, and an injunction
8   requiring Director Thornell to certify Mr. Huggins as eligible for parole on Count 2.

9        B.    In the alternative, a declaration that Mr. Huggins is entitled to community
10  supervision on Count 2, and an injunction requiring Director Thornell to implement Mr.
11  Huggins's entitlement to community supervision on Count 2.

12       C.    An award of attorneys' fees and costs under 42 U.S.C. § 1988 and any other
13  applicable authority; and

14       D.    Such other relief as this Court deems just and proper.

15       RESPECTFULLY SUBMITTED this 9th day of June, 2025.

**COPPERSMITH BROCKELMAN PLC**

By  /s/ Austin C. Yost
        Austin C. Yost
        Kelleen Mull

**ARIZONA JUSTICE PROJECT**
        Lindsay Herf

**MITCHELL STEIN CAREY CHAPMAN PC**
        Karen Singer Smith

*Attorneys for Plaintiff Donald Huggins*

1

## Verification

2       As permitted by 28 U.S.C. § 1746, I, Donald Huggins, declare as follows:

3       1.      I am the plaintiff in this action.

4       2.      I have read the foregoing verified complaint and know the contents thereof.

5       3.      To the best of my knowledge, information, and belief, the factual statements made

6    therein are true and correct.

7       I declare under penalty of perjury under the laws of the United States of America that the

8    foregoing is true and correct.

9       Executed this _$\mathcal{20}$_ day of May 2025.

10

11

12                                    Donald Huggins

13                                          Donald Huggins

14

15

16

17

18

19

20

21

22

23

24

25

26

-26-